Please be seated. Mr. Kalamata. Your Honor, may it please the court, my name is Paul Kalamata. Here with me today is my colleague Justin Curtis. It's our privilege to be here on behalf of the Charleston West Virginia Sanitary Board. I would like to take just a couple of moments to touch on a couple of key facts in the case and I'd like to give you five reasons why this case is not moot. I'd like to finish explaining why we believe EPA had a non-discretionary duty to approve West Virginia's water quality standard to the Charleston Sanitary Board. First of all, the Charleston Sanitary Board is regulated in its wastewater discharge and its collection system discharges to the Kanawha River. One of the pollutants that it has to manage is The state of West Virginia has a default statewide copper standard, both acute and chronic, that is only differentiated by the local water's hardness. The result of that standard for the Charleston Sanitary Board is that in the record it is .010 milligrams acute and .007 chronic. That's a little hard to say so what I'd like to do is change the units simply and convert the milligrams to micrograms for purposes of my argument. So I will mention to you 10 micrograms acute, 7 chronic. You're beginning to lose me. I'm not a scientist. Sure. Well the numbers, the currently applicable numbers to the Sanitary Board that they have to meet. Remember Martini shaking nuts there. That's right. I wish it was that sexy a case but 10 and 7 were allowed to more than 10 acute and 7 chronic. And what happened was the Sanitary Board in 2002 got a 5-year discharge permit that had a copper limit. In 2007, 5 years later, the limit went away. 2012 the limit came back. So Charleston decided we want to get off this copper limit roller coaster. The copper limit also affects other aspects of their facility which I'll touch on in a minute. So rather than the state of West Virginia and US EPA and ending up in court, what they did was they looked to the regulation and there was an EPA procedure for translating that 10 and 7, which is a statewide default number, to something that's appropriate for the characteristics of the Canava River that they discharged to. And so Charleston Sanitary Board developed a work plan to implement this EPA procedure, took it to the state, state approved it. They performed the study. The result was that the 10 and 7 should be 5.62 times higher. So 10 becomes approximately 56, 7 becomes 39. Those are better numbers. They're higher, they're easier to comply with. What's your beef? Is it with the fact that the site-specific plan that you have hasn't been approved by EPA? Or is it with a particular limit in the permit? Or what's your beef? That's exactly right, Your Honor. Which one? I gave you two answers. I'm going to answer one at a time. The beef is that they haven't approved the higher numbers, the 62 and the 39, and they've left the 10 and 7 in place. And that affects us today in a number of ways that makes the case not moot. So I'll give you an example. But what if there's no copper? The basic point that they're making is that under the permit that you're presently operating under, there's no limit on copper effluent. You're exactly right. I guess if they would put it that you're tilting at a windmill or you're tilting at something that doesn't exist because there's no copper effluent limit. If only that were the case, Your Honor, I wouldn't be here. Is there or isn't there? There is, Your Honor. I'd be happy to explain several ways. There is a copper effluent limit? Absolutely, Your Honor. As a matter of fact, it'll sound very familiar to Judge Diaz because in Part A of the permit, which is the effluent limits pages where the specific copper limit was taken out of our permit, there's a provision at the bottom of Part A, and I can give you the citation to the record if you'd like. It is in the Joint Appendix 259 to 63 has the same or very similar language in Part A to the language that Judge Diaz reviewed in the Fola coal case back in 2017. That language says the discharge shall not violate the water quality standard sections of the rules. Part F, and by the way, copper is one of those standards. Part F of the permit speaks to the 14 combined sewer overflow discharges to Zone 1 of the Kanawha River where this discharge or specific standard applies. That provision says that the discharge shall not cause or contribute to an in-stream excursion above any numeric or narrative water quality criteria developed and adopted as part of the West Virginia water quality standards. So Your Honor, even though the specific limit was taken out of Part A, in two places of the permit, there remain an obligation to comply with the applicable water quality standards of which copper is one. You're going to give us five reasons why it's not blue. Could you give us those reasons? That's one, Your Honor. Even better. Before you move on to the next one, I'm trying to remember. Maybe my memory is not the best, but was this argument actually in the brief? That the fact that, in fact, you were bound by some limits notwithstanding the face of the document? Excellent question, Your Honor. In EPA's brief, their whole brief is based on, they assert that the existing permit provides the relief we ask for, quote, a permit that did not oppose a copper effluent. I don't think that, well, answer my question first, yes or no. Yes. In our reply brief, we respond to EPA's primary argument that there is no copper limit applicable to the discharges from the sanitary board, and that is not correct. You make that argument you just presented to us? It is. I don't think you mentioned me by name in that reply brief. At least, I hope you didn't. We did not, Your Honor. I can't say that we're thrilled as a general matter with that principle, but that principle applies. The Fola Cole case applies. It's a West Virginia permit with similar, and as a matter of fact, on the CSO, the Part F, it is much worse language. It's cause or contribute instead of just cause. That's number one. Number two, the permit not only regulates what we can discharge from the treatment plant, it regulates what we can take into the treatment plant. On Joint Appendix page 278, it limits Charleston to taking 8.2 pounds of copper into the treatment plant. That 8.2 pounds is based on the existing 10 and 7 water quality standards. If this court overturns the EPA disapproval of the 5.62 higher water quality standard, the 52 and 39, the 8.2 goes up by 5.62. Instead of 8.2 pounds, we would be able to take into our plant approximately 45 pounds. If you overturn EPA's approval, disapproval, the number that we can take into the plant guaranteed with certainty changes from 8.2 to 45. That makes the case not moot. That is not the possibility of some slight potential relief. That is guaranteed the number will change. It will go up higher. The other thing on page 278 that the permit specifies is that when we get halfway to 8.2, we have to regulate everybody who sends copper to the plant. There's a cost to that. There's a burden to that. It limits our ability to allow our users of the system to expand their copper discharges. It limits our ability to take new folks. When we get to 50% of the 8.2, it triggers that obligation. We're already north of 35%. So if we get, if EPA's disapproval is overturned, we go from half of 8.2 to half of 45. That is a significant regulatory relief that defeats a mootness argument. So the first one was the full of coal. It's due to the purity of the waters. Your Honor, it fully protects. It sounds to me like you're simply asking what your term regulatory relief is, you know, enhanced permission to discharge problematic elements into the Kanawha River. Nothing could be further from the truth, Your Honor. We are the Charleston Sanitary Board. We do not avoid necessary and appropriate requirements. The procedure that we followed is EPA's procedure that was adopted in West for the sole purpose of getting the standard right. Not discharging any amount that's not appropriate, but getting the standard right to reflect. I'm complaining about the fact that it was not approved by EPA. I am complaining. We want the standard right. And the correct standard, Your Honor, is the 56 and 39, and not the 10 and 7. Why wouldn't that be a matter of scientific judgment under the statute for the EPA? What standard they use or whatever. I mean, like it or not, maybe Congress should have drafted a different statute. But like it or not, EPA is given final approval or disapproval authority over state water quality standards. And it happens occasionally that the state will send up a set of standards to the EPA, and the EPA will knock it down. And then the statute is written in a way that allows the EPA to apply its best scientific judgment to state water quality standards. And it's a pretty discretionary standard. And if you're talking about scientific judgments, scientific models and scientific knowledge is advancing and evolving all the time. Are you trying to freeze it back to a previous methodology that the EPA under the statutory language would have the latitude to modify? Nothing of the kind, Your Honor. I'm here today on mootness. I'm here, I've first got to get over a mootness hurdle before we can have the conversation about what the standard is. And with all due respect, Your Honor, I don't believe what you've just articulated is the standard. The Clean Water Act, our first argument is not moot. Judge Floyd, you asked for the five reasons. It's the folicol argument. It's the maximum allowable headworks argument at 278 in the joint appendix. It's copper monitoring that if the higher numbers are provided, we believe we will no longer have to monitor for copper. EPA has suggested we won't have to monitor for copper because West Virginia has a written guidance document that says if you don't have reasonable potential to exceed copper at the point you discharge, you don't have to monitor. And with the higher numbers, we won't have reasonable potential. Is that subject to the state's discretion? It is, but it's a written document where the state in advance has explained how it will exercise its discretion. And it says we will not impose monitoring. EPA in their brief has said, aha, but look, for 10 pollutants, EPA has, in fact, imposed that monitoring. And for nine of the 10, that paragraph ends with it's required by the Copper is the one out of the 10 that doesn't have that statement. We believe if we get the higher numbers, we have demonstrated we won't have reasonable potential end of pipe, and we will be so far below reasonable potential end of pipe that we believe West Virginia will follow their written guidance that says they won't impose monitoring. That is more. You're asking us to adopt a certain scientific view. You're asking us to assume the role of scientists and decide what these affluent limits ought to be, but they should be, you say they should be this rather than that, it should be this, not that. I don't know, I mean, I don't know that we're particularly competent to undertake, to undertake that inquiry. You're almost asking us to be an ab initio reviewing agency for the state water quality standards, and I understand that to be EPA's role, not ours. Your Honor, I am not asking you to do anything at all. What I need to show you today is that if EPA's disapproval of our following their own cookbook, if you overturn EPA's disapproval of the higher numbers, all I have to show you is that gives me the possibility of regulatory relief. Judge Floyd asked for the five, I'm still subject to that water quality standard because of the general compliance language. I've shown you that the amount of copper that I can bring into my plant will be 5.62 times higher. I've pointed out to you that I can get rid of copper monitoring, which is a real cost and regulatory risk, an immediate risk. Also, this standard is not a site-specific standard. West Virginia, and by the way, Judge, let me just mention that when we did this for the record, EPA reviewed that, and they said they support it. They said it's consistent with their guidance. They qualified it, didn't they? They said they were not approving it because you can't approve it in a comment letter. And they let, and by the way, the state of West Virginia. They said this letter does not constitute an approval. I agree, but the state of West Virginia, whose water quality standards these are, approved it, took it through the regulatory process, took it through the legislative process, and then when it came time for EPA to approve it, the 60 days to approve or 90 days to disapprove, they ignored the statutory deadline, and they said, we take no action on the 90th day. And here's what's significant that gets to your point, Judge Wilkinson. On the 90th day, the Clean Water Act requires that if there's a deficiency in the science, the state standard has to be based on a sound scientific rationale. We have the gold standard. We have an EPA procedure that's been promulgated into the West Virginia regulation and approved by EPA. I don't know whether you do or whether you don't. Well, that's in the record, Your Honor. It sounds like to me, you're making an argument that ought to be made before agencies with a considerable specialized knowledge that, you know, I lack. I know the limits of my own capabilities, and I just find myself hard-pressed to say exactly what the effluent limit should be for each of these various metallic or impure substances. We're not asking you to do that at all, Your Honor. All we're asking you to do is determine that we have standing to bring, to have our day in court and the district court to evaluate EPA's decision. In this case, though, on the 90th day, the Clean Water Act... The decision in disapproving the state standards? They did, and they based it... So why wouldn't it be up here on the merits in the event that it's not moot? Because the case was dismissed on mootness grounds, Your Honor, because a new permit, this arose out of the 2012 permit that had a limit. The 2017 permit, the limit was removed. That caused Judge Goodwin to say the case is moot, and for the reasons I've explained to you, it's not moot. We still can get regulatory relief if EPA's decision disapproving the standard is overturned. Thank you, sir. Thank you. Mr. Bielert, let's hear from you, sir. Good morning. May it please the Court. My name is Jeff Bielert. I'm from the Department of Justice, and I'm here representing the EPA. Judge Diaz, I'm glad you asked a question about their argument as to the copper limits. You don't have to take my word for it. You can look at their opening brief. Page 17, and this is their words, the 2017 permit does not include a copper discharge limit. You can turn to page 35 of their brief. The copper limit at issue was removed from the permit in 2017. So I'm a little confused by the arguments that they're advancing here today. They themselves, in their opening brief, acknowledged that there is no copper permit under the 2017 permit that was issued, and they are correct. Over the years, this has had a copper limit imposed by the Department in West Virginia, and other years it has not. But what we do know on this record is that the Department has always required monitoring, monitoring copper. And so the district court did what it was supposed to do here. It looked at this record, it carefully reviewed it, and it concluded that this case is moot. Why is this case moot? This case is moot because, as of right now, there is no injury. The board must come before the court to get into federal court and establish a concrete, particularized injury. This comes from the Supreme Court cases, the Nike case, the Spokane case, cases that we cited throughout our brief. The Constitution confers limited authority to federal courts. Courts can only decide cases and controversies. This requires an injury that's traceable and redressable by the court, and they have the burden of demonstrating that. Is this the 2017 permit? So the 2017 permit, Your Honor, was issued while this litigation was ongoing. This litigation started over what they specifically talk about is that site specific copper criterion. Under the 2012 permit, when it was issued, the department had, and they set, a limit on the amount of copper that the board could discharge. They're unhappy with that limit. They didn't like it. They wanted to set a higher level. And understandably, they may do so. West Virginia provides them with that opportunity, and the Clean Water Act allows the EPA to review site-specific- How long is the present permit in effect? For five years, Your Honor. So it would be 2022. When the next permit would be issued. But your view is that there's no copper effluent limit in the 2017, and that can't be until 2022? I mean, couldn't the permit be modified? It could, Your Honor. And that's, they have argued in their brief that there's a substantial likelihood that the permit will be monitored. Why do you say there's not a substantial likelihood that the permit, that the permit will be modified? Well, because what, when the 2017 permit was issued, what the department, the West Virginia Department of Environmental Protection did is it looked at monitoring data over the, over a five-year period. And it makes what's called a reasonable potential determination. And so it looks at that data, and we know this. This is in the record. It looked at that data and it said, there's no reasonable likelihood that under the terms of this permit that they're going to violate, that they're going to exceed the limitations set forth under the statewide criteria. So we know that on this record. They're the ones that operate this plant. They have this data. They're constantly monitoring this. If there were any indication, and there's not in this record, if there are any indication that they are going to exceed, somehow exceed the, the statewide copper criteria that is in place, they need to come forward with that. We don't have that in this record. There's nothing to suggest, and they point to nothing in the record to suggest that sometime between now and 2022, that there's going to be an increase, that this monitoring is going to somehow suggest that they're going to exceed the statewide criteria that are in place. And, oh, by the way, they say that there's a one time that the department could do this based on a one-time instance for monitoring, but they've never pointed any example that the state has done this. In fact, the state, when it reissues its permit, it does so, and it does this reasonable potential determination at the end of the permit cycle, at the five years. If not... I thought their point, which I haven't heard from yet, but you made a decision, you disapprove, and the rationale was post hoc, not going, not before the decision was made, and that's what they're complaining about. Well, so I, I want to explain, I think this, the term post hoc is a bit misunderstood in this context, Your Honor. It is true that the EPA did not issue a decision to approve or disapprove the site-specific criterion submitted by the state within the deadlines under the Clean Water Act, so the Clean Water Act tells the agency that it must approve within 60 days or disapprove within 90 days, and there's no dispute here. I mean, EPA acknowledged in its answer that it did not comply with those statutory deadlines, but then you look at, does that remove the EPA's discretion to issue a decision, and the answer is no, and there's very strong case law, we cited it in our, in our briefing from this court and the Supreme Court and other circuits, frankly, that says that an agency, even though it may miss a statutory deadline, even though the statute says shall, that does not deprive the agency of its discretion to reach a decision, and... And is there any final decision, I mean, the district court dismissed on grounds of mootness, is there any final decision approving or disapproving the state standards that's ripe for us to decide? So the EPA did reach a decision disapproving this particular site-specific... Yes, and what I'm asking you is, is that particular decision that EPA reached, is that ripe for decision here? So the, you're right, Your Honor, the district court dismissed on mootness grounds. Why did it dismiss on mootness grounds? I understand you're, you've just been giving an argument as to why it dismissed on mootness grounds, you, you may well be right, I don't know, you may well be, but my view is let's, assuming arguendo, that we didn't agree with you on the mootness ground, has the, has the district court rendered a final decision, has EPA rendered a final decision disapproving the state standards that is ripe for us to review? Well, so let me, the short answer, yes, EPA did issue a decision disapproving this particular, and that it's a joint appendix 66 to 80, the EPA gave the reasons why it disapproved the site-specific, but to answer your question, no, the district court, which had the full record before it, did not have an opportunity, or at least because it ruled on mootness, did not review the EPA's final decision in this case. So the, the, this was not before the district court, it ruled on, on mootness grounds, we, the government, advanced arguments as to why, even if it wasn't moot, that this under the Administrative Procedure Act. I thought you argued in your brief that it was, you know, the standard was an arbitrary and capricious one, and that under the statutory standards, it really could not be seen to be arbitrary and capricious. That's correct, Your Honor. So the, the Administrative Procedure Act... So you argued alternatively on the merits. That's correct, Your Honor. That this, we ask that if you find that these claims are not moot, that you please remand to the district court, for the district court in the first instance. What are you trying to do? You want, do you want, are you asking for a remand for the district court to resolve on the merits? Are you asking us to get to your alternative argument, or what? I think our brief lays this out, Your Honor. We ask you to affirm the district court's decision on mootness. We think the district court got it absolutely right. That's part one of our argument. It is, mootness is a threshold issue that these, that the board cannot overcome in this case, and we give you that, that argument, and then part two of our brief basically says... And your, and your basic reason is that there's no copper effluent limit in the 2017 permit. And that whether there's a modification before the 2022 permit is issued is speculative, and if it, and if it, if the modification does occur, they would certainly be open to challenge, and the, the appellants here would have their day in court. Yes, Your Honor. That's correct. And just a couple of things. I mean, you look at the injuries that the Supreme Court has talked about. I mean, it must be certainly impending. It can't be too speculative. That's the Clapper decision. I know, yeah. Is there, is there, is there a total complaint with the copper limitation, or is it, is it a broader complaint having to do generally with the fact that the EPA disapproved the state standards, which is it, is it, is it a narrowly focused complaint or is it a broader... If you look at the actual complaint that they filed, the supplemental complaint that they filed in the district court, that rate, this is at JA 327 to 340, these are counts three through five, these are challenges brought under the Administrative Procedure Act, challenging the EPA's disapproval decision. So what they are... On a broader ground than just copper effluent limits? They are arguing that the, that the agency violated the Administrative Procedure Act and reached an arbitrary and capricious decision when it disapproved... With respect to copper or with respect to the state standards as a whole? Right. So it's, it's a little complicated. I don't mean to evade your answer. I want to try to explain this. So the, the, the criteria, the statewide criteria that are in place, that are currently in place, those criteria are used in individual permits. So it's not that you have a right to some criteria. It's that when the permit itself is what they, was what tells them what they're allowed to do and on, in this particular wastewater treatment site. So you use that criteria to come up with either setting a limit or not setting a limit. The 2012 permit used the criteria and set a limit. They didn't like that. So they brought a case and they wanted to change the criterion so they can adjust the permit and allow them to discharge something more. That, that decision, that disapproval decision to use this water effect ratio, this, this adjustment to the criterion, that's what they were, that's what they were challenging. So our argument is, look, that was a live controversy up until the point when the West Virginia Department of Environmental Protection issued a new permit. The new permit, it looked at all the data that had been collected and it determined there's no reasonable likelihood that they are going to exceed the statewide criteria that are in place. So therefore they did not set the, this is the West Virginia Department Environmental Protection, did not set an effluent limitation on the board's discharge of copper into this river. Because the circumstances have changed, because this permit does not require them to, does not set a limitation on their copper, that we argue there's no injury. West Virginia is not the final word. No, your honor. So West Virginia adopts. The West Virginia Department of Environmental Resources has imposed no copper limit. Is that, is that the final word given that those state standards are subject to EPA approval? So every three years under the Clean Water Act, the states must review. We discussed this in our brief. There's an obligation on the states to review their, their water quality standards, and then if they want to make a modification, they submit that to the EPA for review. So there is an existing statewide criteria in place that continues to be in place and that the EPA has, to my knowledge, reviewed, and there's, anytime they want to amend that, they come to the EPA. That's what's occurring here. This was a site-specific change that they wanted to seek for this particular wastewater treatment site. And that's what the EPA reviewed. And the EPA disapproved the proposal that was submitted. And it did so exactly what the Clean Water Act requires it to do. And this court's decision in the NRDC, the 1993 case, it talks about what the EPA is required to do. I mean, the, the, the EPA has to apply and make sure that the criteria are scientifically defensible, that they are protective of designated use. And that's exactly what the EPA did here. Can I ask about the issue of injury? Because I understood the principal injury here in the brief to be this issue of monitoring and whether or not it's required or discretionary. I heard the argument here today that copper is the one effluent that is and that they might be able to make an argument that they're not subject to monitoring. What's, what's your view about that? Well, Your Honor, a couple of responses. First off, we point this in the, what the department has done. It's true that there is this West Virginia guidance, but it appears to be discretionary. The West Virginia Department of Environmental Protection, it's up to them whether to impose monitoring. And so our, in previous permits that have been issued by the state, it has, as, as the board points out, it has imposed a copper limit and it has not. But in all of those permits, going back to, I believe, 2002, 2007, 2012, it's always required monitoring. And then we gave the example of some of the other metals. And this is one of the reasons why there's no injury because they're currently monitoring for other metals. And those other metals include arsenic, silver, and nickel. This is a J297. That monitoring is required by the state. And so for them to come into court and say, well, if I take their argument is, well, if the EPA had approved this particular site-specific criterion, we wouldn't have to monitor. But my argument, my response to that is that's too speculative, Your Honor. And the district court took a careful look at this and it said, I have no way of knowing what the Department of Environmental Protection, the West Virginia Department would have done in this situation. They, they do the calculations in their brief, but we don't know that the department would have reached the same conclusion and yes, perhaps they could come to the department and ask it to, to get rid of monitoring, but we, it's too speculative. That's my point. My point is, is there's plenty of case law that tells us what article three demands and they have not reached, they have not satisfied those case law. They have not been able to come to this court and use monitoring as a concrete injury that would allow them. Because the monitoring costs have been imposed by the state. That's correct, Your Honor. And the state has imposed monitoring in, when it has found no reasonable likelihood of them exceeding the statewide criteria. And it's, and it has required monitoring when it is, when it's set a limit and it's in its permit. And on this record, that's my point. On this record, there's no indication that monitoring amounts to an injury that would allow them. Your whole, if you sum up your view, your whole, your view of this case is that they're tilting at windmills. I think that's correct, Your Honor. I think that right now we have a reasonable, a determination made by the state that there's no reasonable likelihood that they are going to exceed the, the, the limitation, the statewide criteria. And yes, they would like to have a more lenient standard, but there's no injury. There's no injury under the current permit and they can't come into court. That, that is my argument, Your Honor. And we ask you to affirm the district court's decision on, on mootness. But if the court concludes that these claims are not moot, then I think you should address the merits of, of their interpretation of the Clean Water Act. The district court correctly concluded that their interpretation of the Clean Water Act is untenable. We agree with that conclusion and on the merits of that claim, we think that the, the board would lose. As to the APA claims, if the court finds that they are, concludes that they are not moot, we ask that you remand for the district court to address those in the first instance, if the court were to reach the merits, I think what you'll, you'll find is under the deferential standard of the APA the EPA rationally explained its decision. And, and we would ask you to affirm on that ground as well, if you reach it. Unless the court has any further questions. Thank you. Thank you, sir. Now, maybe you have some rebuttal time. Thank you, Your Honor. I'd like to stick to mootness because that's critical to giving my client its day in court on the merits, Your Honor. So I'm not asking this panel to deal with the merits, but in terms of mootness, the first reason, our standard is if, if a, if an overturning EPA's disapproval has the possibility to grant any effectual relief, then my, then the case is not moot. And here I've explained to you that for the limitation on what we can bring into the plan, the maximum allowable head works, which is on joint appendix 278, if EPA is overturned, instead of 8.2, we get approximately 45 pounds. That defeats mootness. It is a concrete, it is not the possibility. I guess their point is that you're a little bit hoisted on your own petard because your, your brief says there's no copper effluent limit in the 2017 permit. But, but Your Honor, my brief also says that there's a maximum allowable head works loading. You're letting EPA recharacterize this case to one small part of the permit. The copper affects multiple parts of the permit. And all I have to show you is that I can get relief on any of those parts, not just the piece that they'd like to talk about. And by the way, Your Honor, you didn't hear Mr. Baylor come up here and tell you what I argued about full of coal, that the general water quality standard compliance language in part A and part F has, has taken the copper limit completely away. It is not. It is taken it out of the site specific part of part A, but it, but compliance with the 10 and seven standards remain. I'd ask you to look at that and revisit your full of coal decision. The third reason is the monitoring. Do they speak specifically to copper? Full of coal? No, it's, it spoke to metals, but it spoke to that very part A did speak to copper in the 2012 permit, but that specific copper limit was taken out in 2017, which caused the mootness argument. And our point is on the, on those very same pages, the general water quality standard compliance language comes in. That language says the discharge shall not violate any numeric or narrative limit adopted by the state. And that includes the very copper limit that we're, that we're trying to get raised through, through this process. So we, it's not moot because of the headworks loading number would go up. That's concrete. That's not speculative in any way. It's not moot because we have a very good chance, better than a reasonable possibility of getting the monitoring removed based on the written state guidance, because if, if the copper limits go up by 5.62 times, there, we're so far away from the limit that monitoring no longer makes sense. And we think in those conditions, we can get EPA to follow their, excuse me, DEP to implement their guidance that says we won't put limits in. The other nine metals are different because monitoring is required for other reasons as specified on page 278. Also this water quality, the state's water quality standard that was disapproved is in our name. It is not a discharge, a site specific standard. It says for, for the Charleston sanitary board, the copper standard shall be 5.62 times the existing standard. It's only available to us. I'm worried about the fact that we're, we're arguing about what the copper effluent standards should be in the abstract with, without sufficient assurance that they're actually biting anybody or injuring anybody in this particular case. I mean, a lot of your argument seems to be, and for all I know, you may be right, because I don't have the scientific expertise to understand it. But your, your view is that the copper effluent standards should be higher than they presently are. And fair enough, that's okay. But that's more on a sort of a general abstract argument in the absence of any particular argument that they're biting your client or injuring you under this present permit. In other words, I feel like we're, we are sort of drifting in, taking the, you know, the Supreme Court says, well, there has to be a substantial likelihood. And it seems to me you're taking those words pretty far and saying that because the copper standards are too high as an abstract matter, that there's a high likelihood of injury applied to us in an injurious fashion during the life of this 2017 permit, and I just don't know whether the injury or the likelihood of future injury has reached that level of concreteness. You see, what's annoying me about it is it looks, it looks like what you're saying is, is you have an interesting argument, but it looks a little futuristic to me. It looks a little futuristic. I don't know. I see I'm out of time. May I respond, Your Honor? Yeah, sure. I don't, I don't want to be futuristic at all. I want to be simple and clear. On page 278 of the joint record, the permit specifies a maximum allowable headworks loading for copper of 8.2 pounds. So without the benefit of the standard that was disapproved, I'm limited to 8.2 pounds. If I get the standard that West Virginia adopted for us, the 8.2 gets multiplied by 5.62. It's approximately 45. This is concrete. I don't want it nagging at you. 45 is higher than 8, and it is regulatory relief that is certain. Where is that in your brief? It's on page, appellant's brief on page 48. Of the opening brief? Of the opening brief, Your Honor. So we teed this up. It is a concrete harm. You can ignore anything else we talked about today, but that fact alone, that 45 is higher than 8, is the relief that the court can grant by overturning EPA's disapproval. That defeats mootness. Your Honor, we would ask that you do reverse the district's court's finding regarding mootness. We would also ask, rely on our briefs and ask you to hold that EPA violated a mandatory duty to approve the standard that was presented to them. Thank you very much. How can that be a mandatory duty, given the way the statute is written? May I respond? Relying on EPA's scientific judgment, and that's a mandatory duty? It's simple. The EPA reviews the state's water quality standard to see if it's based on, it has a valid scientific basis. Now, mandatory time limits, but it's not a mandatory. I'll get to those in a second. The standard of review is, did the state's water quality standard have a sound scientific basis? And that basis, Your Honor, here is EPA's translator procedure that has been promulgated with all the protections of rulemaking into the rule. All right, counsel. Thank you, Your Honor. We thank you. We'll adjourn court and we'll come down and greet counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Albert Diaz, Henry F. Floyd